# Exhibit E

**FEDERAL MEDIATION AND CONCILIATION SERVICE, ADMINISTRATOR**

| | |
|---|---|
| In the Matter of Arbitration Between: | ARBITRATION AWARD |
| CITGO PETROLEUM CORPORATION | GRIEVANCE CONCERNING |
| And | SUBCONTRACTING WORK |
| UNITED STEELWORKERS UNION | |
| LOCAL UNION NO. 7-517 | |
| FMCS CASE NO. 17-54826 | GRIEVANCE NO. A10-086 |

**ALAN J. COOK**
**IMPARTIAL ARBITRATOR**

APPEARANCES:

    For the Employer ("Citgo")

        Jones Day

            By:    Michael J. Gray, E. Michael Rossman and Brandon L. Dixon

    For the Union

        Robert E. Lofton, USW Staff Representative

**STATEMENT**

The parties were not able to reach a mutually satisfactory settlement of a certain grievance and therefore submitted the matter to arbitration in accordance with the terms of their Collective Bargaining Agreement. Alan J. Cook was selected to serve as Impartial Arbitrator.

A hearing was held in Bolingbrook, Illinois on March 13, 2018. At this hearing the parties were afforded an opportunity to present oral and written evidence, to examine and cross-examine witnesses, and to make such arguments as were deemed pertinent. The hearing

was closed on April 27, 2018 upon receipt of a closing statement from each party. The parties agreed the Arbitrator would submit this Award on or before July 20, 2018.

## ISSUE

The Arbitrator finds the Issue for this case is whether the Company's use of outside contractors in the Solvents Loading Rack at its Lemont Refinery violated the terms of the parties' Collective Bargaining Agreement; and, if it did, what remedy would be appropriate?

## BACKGROUND STATEMENT

Citgo acquired the refinery operation in Lemont, Illinois on May 1, 1997. At this location the Company produces gasoline, diesel fuel and other products including petrochemicals. The Union represents approximately 243 hourly production and maintenance employees at this facility. Citgo and the Union approved their first Collective Bargaining Agreement in April 2000, and they have adopted several three-year renewals since that time. The contract that is pertinent to this grievance runs from 2009 to 2012. (Jt. Ex. 1). Many contract provisions have remained the same during these renewals.

This grievance pertains to the process of providing petrochemicals to customer trucks. To obtain petrochemicals, a customer sends a tanker truck to Citgo's solvents loading rack. This rack has four bays for trucks to load solvents and a blend bay to load products that contain a mixture of petrochemicals. The loading rack is open for business continuously from Sunday at 10:30 p.m. through Friday at 10:30 p.m. Its least busiest time of operation is during the early morning hours.

Customer trucks at the solvent loading rack are filled exclusively by bargaining unit Loaders. Eight Loaders work during three shifts. Three Loaders work from 6:00 a.m. to 2:00

p.m., two Loaders work from 2:00 p.m. to 10:00 p.m., and two Loaders work from 10:00 p.m. to 6:00 a.m. An additional Loader works a relief schedule. The Loaders typically fill 25 to 30 trucks each day. Loaders have to be very careful in the performance of their duties. Mistakes can lead to chemical spills and other hazardous problems.

A Loader has two key components to his job. The first involves paperwork that must be completed before and after loading a customer's order. This duty includes processing a load request form, multiple copies of a bill of loading, a certificate of analysis with associated seals and placecards, a load verification sheet, a meter ticket, and generating a detailed load list form. To properly process these forms, a Loader will utilize a SAP computer program and seek assistance from a "help center." It is important to properly prepare this paperwork to avoid mistakes that could involve dangerous situations.

The second component of a Loader's job is to verify that each truck is in a proper and safe condition to receive petrochemicals and then to load fuel into a customer's truck. The Loader must also be cognizant of the fact that certain petrochemicals can only be loaded at designated bays. If more than one truck wants this type of fuel, the additional trucks have to wait their turn for service.

The Company's Loaders perform this work from the time Citgo purchased the facility in 1997 until 2010 when management decided to change how Loaders performed their job. The Company had several reasons for making a change. Citgo decided having Loaders prepare and process paperwork caused them to spend less time filling tanker trucks. Citgo received complaints from customers that trucks were waiting too long at the refinery to receive their fuel and consequently they incurred delay in supplying product to their customers.

3

In addition, Citgo decided it was paying too much money to its customers as demurrage penalties. Citgo pays customers a penalty if a truck waits more than two hours at the Lemont refinery without being loaded. At the arbitration hearing, the Company claimed it paid customers approximately $293,000 in 2010 in demurrage penalties.

To address this situation, Citgo decided to hire new contract workers from a staffing agency as Solvents Clerks to prepare and complete paperwork that Loaders had processed in filling customers' orders. In that way, Loaders could focus on their sole task of filling tanker trucks. In August 2010 management informed the Union it planned to make this change. On September 27, 2010 Supervisor Randy Cox issued a notice that two clerks had been hired. (Un. Ex. 4). One clerk worked the hours of 4:00 a.m. to 12:00 p.m. The other clerk worked from 12:00 p.m. to 8:00 p.m. Loaders were told they would still do the paperwork for trucks being serviced between 8:00 p.m. and 4:00 a.m. The Union was also informed this change was being made for a six month trial basis. (Jt. Ex. 7). Citgo proceeded to implement this change in Loaders' duties on a permanent basis after it decided the change increased efficiency in loading trucks. The Company prepared a Business Impact Analysis on July 11, 2011 that described beneficial changes in truck demurrage, customer satisfaction and number of trucks processed. (Jt. Ex. 6).

On September 8, 2010 the Union filed the instant grievance wherein it protested that "the Company has employed 2 contractor clerks to perform the work of solvents rack employees." The Company denied the grievance. When the parties could not resolve the dispute through the steps of the grievance procedure, the grievance proceeded to arbitration for a final and binding resolution.

4

## **PERTINENT POSITIONS OF THE CONTRACT**

### ARTICLE II
### Recognition and Scope

**SECTION 1.** The Company recognizes the Union as the sole and exclusive Collective Bargaining Agency for all hourly production and maintenance employees of the Company at its Lemont, Illinois Refinery and facilities, including Control Laboratory and Loading employees, but excluding . . . office clerical employees . . . for the purpose of collective bargaining with respect to pay, wages, hours, and other conditions of employment.

### ARTICLE IV
### Seniority

**SECTION 3.** Bidding/Promotions

B.  Plant-Wide Bids

1. In the event there is an opening in any department, the lowest job in that department may be open for bid. Vacancies will be posted on a plant-wide basis.

### ARTICLE V
### Hours of Work

**SECTION 5.** All shift workers will be required to remain on the job until relieved or otherwise released.

Shift vacancies in the Operations Department will be filled except when a unit is down for turnaround, or for other extended periods. During such times only the top classifications are required to be filled. At such times as when a unit is substantially operating, all shifts will be filled. Shift vacancies in Sponge Coker Coke Handling, Laboratory and Loading positions will be filled as the workloads dictate. Management is responsible for filling shift vacancies that are required for Main Fire Brigade responsibilities.

### ARTICLE VI
### Overtime

**SECTION 1.**

A. An employee will be paid at the rate of one and one-half times his regular straight time rate of pay for all time worked by him in excess of forty (40) hours in any one work week or in excess of his regular weekly work schedule.

5

B.     An employee will be paid at the rate of one and one-half times his regular straight time rate for all time worked by him in excess of his scheduled hours in any one work day, provided he has worked or does work all of his regularly scheduled hours during that week.

## ARTICLE IX
## General Working Conditions

**SECTION 4.**  Subject to the provisions of this Agreement and to the rights of the Union as the Collective Bargaining Agency, it is expressly understood and agreed that the usual and customary rights of the employer remain unimpaired.  It is also understood that these rights include, but are not limited to, the right to manage the business and direct the workforce; determine the number of employees required, hire contractors and establish safety rules; hire, suspend, layoff or discharge it's employees; enforce established job qualifications and modify job qualifications; and establish and promulgate those rules, policies, and regulations governing the workforce which are not mandatory subjects of bargaining according to the NLRA.

**SECTION 15.**  The Company agrees that it will actively pursue the objectives of increasing the efficiency, productivity and capability of the bargaining unit workforce.  During the term of this Agreement, the company agrees not to displace any bargaining unit employees with outside contractors and that no bargaining unit employee will suffer a reduction in regularly scheduled hours due to the Company's use of contractors.

**SECTION 16.**  No supervisor will do any work regularly performed by the employees in the bargaining unit except in [various listed instances].

## ARTICLE X
## Grievance Procedure

F.     The Arbitrator will be governed wholly by this Agreement and will have no power to change the Agreement by adding to or taking away any of its terms . . .

## ARTICLE XIII
## Departments/Responsibilities

Section 1.     Departmental Alignments.

    A.     <u>Operating Department</u>

    Area 4
        Solvents Loading

6

        Area 4 Posts
        Solvents Loading

Section 2.    Lines of Progression

    A.    <u>Operations Department Progression</u>

    Area 4 (Blending, Transfer, Loading)

    Area 4 will have two (2) lines of progression – Canal Dock / Tank Car Loading / Solvents Loading and Blending & Transfer. Employees will bid from the Relief Pool Technician position to an Operations Technician Level "A" position in a line of progression. Relief Pool Technicians' second and third posts will be determined by default based on their primary post assignments. (Example: 1st post = Loading; 2nd and 3rd posts = Loading). Employees assigned the Loading line of progression will select their vacation in their primary loading assignment group by plant seniority. Line of progression Operations Technicians will be scheduled the week before and the week following their selected vacation periods as they were scheduled at the time the vacation was selected.

    The Canal Dock / Solvents Loading / Tank Car Loading line of progression will not include a Chief Operator classification. Instead, it will consist of all Level "A" Operations Technicians who have qualified on two (2) Loading positions. After the Initial Filing is completed, secondary Loading position assignments will be identified on the promotional bid sheet for line of progression primary assignments.

Section 4.    Normal Filling-Operations

    D.    <u>Loading Positions</u>

        1.    Canal/Dockman/Solvents Loader/Tank Car Loaders

    * Offer to qualified Relief Pool Technicians in that Area (Area 4)

    * If unfilled, force senior qualified Relief Pool Technician whose primary unit is that of the vacant position . . .

**LETTER OF UNDERSTANDING**
**Training Curriculum Development**

The parties agree that the training and education of the refinery work force are necessary components to a safe, efficient, and productive facility. In line with this mutual objective, the parties agree to the following:

7

- The purpose of the meetings will be to provide for the opportunity for the Union and the Company to share views, suggestions, proposals and information pertaining to the training of the workers presented by the Union and the development of the curriculum for such training.

-

## POSITIONS OF THE PARTIES

Union:

The Union asserts Citgo never offered to bargain over its decision to hire two contractor clerks. It points out these clerks performed work that had been part of the assigned duties of Loaders. The Union argues there is no language in the contract that permits contractors to permanently take away bargaining unit work. It contends this work remains in the bargaining unit as shown by the fact Loaders still perform the work from 8:00 p.m. to 4:00 a.m.

The Union claims the Company does not have a unilateral right to permanently subcontract production work. If it did have this right, this action could lead to erosion of the bargaining unit.

The Union recognizes Citgo's desire to increase efficiency and lower demurrage expense. It acknowledges these goals were achieved by adding two persons to the solvents loading rack operation. However, it claims since these two people were doing bargaining unit work, they should have been bargaining unit members. If the same work was being performed by a larger number of workers, the Union argues one would expect to see more efficiency and a lower demurrage expense. The Union claims these two positions should have been filled by bargaining unit members. The Union points out its members satisfactorily performed this work from 2000 to 2010, and it claims if the Company wanted to use more highly trained workers to do this job it could have offered additional training to Union members especially for paperwork including SAP programs.

8

The Union also claims the Company's action violated the relevant parts of the following terms of the Contract:

1. Article II, Sec. 1 – The Recognition and Scope Clause
   The Union is the exclusive Collective Bargaining Agency

2. Article IV, Sec. 3.B. – Seniority
   The provision discusses job bidding, filling of vacancies and promotions within a department.

3. Article V, Sec. 5 – Hours of Work
   This provision discusses the filling of shift vacancies

4. Article VI – Overtime

5. Article IX, Sec. 16 – General Working Conditions
   Supervisors are not to perform "any work regularly performed by the employees in the bargaining unit" except in stated situations.

6. Article XIII, Sec. 1 – Departments and Responsibilities
   Area 4 – includes Solvents Loading

   Area 4 Posts – includes Solvents Loading

   Area 4 Line of Progression includes Solvents Loading

<u>Company</u>:

Citgo claims its hiring of two contractor clerks is permitted by controlling contract language. The Company notes the language of Article IX, Section 4 gives it the right to "hire contractors." It points out it also complied with the provisions of Article IX, Section 15 by not "displacing any bargaining unit employees with outside contractors" and by not causing union members to "suffer reduction in regularly scheduled hours." It finds further support for its position in Article IX, Section 4's statement that the Company has the right to "manage the business and direct the workforce." Citgo claims it achieved a more efficient operation, increased customer satisfaction, lowered amount of demurrage and a higher number of loaded trucks.

9

In addition, the Company claims support for its action in the language of Article IX, Section 15 that directs Citgo to "actively pursue the objective of increasing the efficiency, productivity and capability . . . of the bargaining unit workforce." Citgo claims it achieved these goals by hiring two contractor clerks. In addition, the Company argues the terms of the contract do not support the Union's position. It claims a review of contractual terms relied on by the Union are not persuasive for two basic reasons. Citgo claims these provisions do not restrict use of third party contractors and they do not give the Union exclusive rights to particular work.

Furthermore, Citgo points out it has a history at its Lemont facility of hiring contractors to perform same job duties as bargaining unit maintenance employees. The Company argues in this case it is following a practice it has implemented in the past.

## DISCUSSION AND DECISION

Citgo purchased the subject facility in 1997. From that time to 2010 Loaders at the solvents tank loading racks not only loaded tanker trucks but also processed the paperwork component associated with that job. In August 2010 the Company informed the Union it was hiring workers from a staffing agency to work in this operation as Solvents Clerks. These individuals would take over processing the paperwork Loaders previously performed so that now Loaders would be primarily working on loading tanker trucks.

One Solvent Clerk worked from 4:00 a.m. to 12:00 p.m. The other Solvent Clerk worked from 12:00 p.m. to 8:00 p.m. However, it developed that Loaders continued to process paperwork in certain situations. Loaders still performed this work from 8:00 p.m. to 4:00 a.m. since this work was a twenty-four hour operation. Loaders also completed the paperwork when a Solvent Clerk was absent or could not perform the work for other reasons.

Citgo asserts it made this change for several reasons. It wanted to reduce the time trucks waited to be fully loaded. If the fueling process took over two hours, Citgo had to pay a demurrage penalty, and Citgo believed use of clerks in the operation would decrease the waiting time for trucks and the demurrage penalty. It also claimed it could process more trucks if clerks handled the paperwork. It further believed this change would improve its relationship with customers who were making complaints about long waiting times for their trucks.

The Union viewed the addition of Solvents Clerks as an attack on the integrity of its bargaining unit. On September 8, 2010 the Union filed the instant grievance to challenge the addition of Solvents Clerks to the loading racks operation. On September 27, 2010 Citgo denied the grievance and stated the clerks would work a six month trial period after which their work performance would be evaluated. On that same day, the Solvents Clerks began their work processing paperwork in the loading rack and Loaders stopped doing this work from 4:00 a.m. to 8:00 p.m.

On July 11, 2011 Union and Company representatives met to discuss this issue. The Company distributed a "Business Impact Analysis" (Jt. Ex. 6) that described improvements in reducing demurrage, increasing customer satisfaction and increasing the number of trucks loaded in a four month period of time. The Company also stated it planned to continue to use the services of Contract Clerks and it would further evaluate their performance in the future. The parties were not able to resolve their dispute, and grievance proceeded to Arbitration in accordance with the provisions of Article X of their Contract.

The parties' Agreement recognizes certain management rights. Article IX, Section 4 states in relevant part as follows:

> Subject to the provisions of this Agreement and to the rights of the Union as the Collective Bargaining Agency, it is expressly understood and agreed that the

11

> usual and customary rights of the employer remain unimpaired. It is also understood that these rights include, but are not limited to, **the right to** manage the business and direct the workforce; . . . **hire contractors**; and establish and promulgate those rules, policies, and regulations governing the workforce which are not mandatory subjects of bargaining according to the NLRA. (Emphasis supplied.)

The right to hire contractors is restricted by the terms of Section 15 where it provides "the company agrees not to displace any bargaining unit employees with outside contractors and that no bargaining unit employee will suffer a reduction in regularly scheduled hours due to the Company's use of contractors."

In this case, Citgo exercised its right to hire a contractor staffing agency. In addition, the evidence shows the hiring of two Clerks did not displace any bargaining unit employees and no Union member suffered a reduction in regularly scheduled hours. Citgo has also maintained it hired these Clerks to increase the efficiency of its operations and increase the number of trucks it loaded. These objectives are referenced in the Contract. Article IX, Sec. 15 provides in relevant part that "Company agrees that it will actively pursue the objectives of increasing the efficiency, productivity . . ." The record developed in this case shows the Company's hiring of Solvents Clerks led to higher efficiency and productivity. The Union has not shown that the Company's action violated the terms of the Contract or caused any harm to the bargaining unit.

The language of the Contract cannot be ignored. The authority of the Arbitrator is limited by the following provisions of the Contract. Article X, Section F states in pertinent part: "The Arbitrator will be governed wholly by this Agreement and will have no power to change the Agreement by adding to or taking away any of its terms. . . ." If the Arbitrator were to ignore the clear and unambiguous terms of the Contract, the Award could be set aside by a court of law.

However, there is another aspect of this case that must be considered. The National Labor Relations Act places on employers a mandatory duty to bargain with authorized employee

representatives on subjects that include rates of pay, wages, hours of employment and other conditions of employment (29 U.S.C. Sec. 151 et seq.). Elkouri and Elkouri in their treatise <u>How Arbitration Works</u> (6th ed., 2003) at 945 make the following statement in this regard.

> It is well settled that unilateral decisions made by an employer during the course of a collective bargaining relationship concerning matters that are mandatory subjects of bargaining are regarded as per se refusal to bargain. (Citation omitted.)

In addition, Elkouri and Elkouri state on page 646 that:

> In general, the tendency has been to expand the area (of mandatory bargaining subjects). For instance, the NLRB has moved significantly in holding economic decisions of management to be mandatory subjects of bargaining if job security or working conditions are affected. (Citation omitted.)

In the case at hand, the Company carved out a significant part of a Loader's duties and gave it to an outside contractor for reasons of economy and efficiency. Loaders' working conditions and job security were affected by Citgo's action in removing the paperwork component of their job. The Union protested the Company's action, and it asked the Company to bargain over this issue. Citgo rejected the request to bargain and took unilateral action to implement its decision to hire Clerks to perform the paperwork part of the Loaders' duties. Citgo's action violated its duty to bargain over its plan to make a significant change in a Loader's duties.

Bargaining over this action might help the parties reach an accommodation of this dispute. It is in both parties' best interest to pursue efforts to operate more efficiently, reduce wait times to lower demurrage, increase number of trucks loaded, provide forms on-line, increase customer satisfaction and expedite the job bidding process. When the cost of outside contractors is compared to reduction in demurrage, the savings may not be significant. Loaders can be trained to operate SAP programs and other computer applications. The parties have Letter of

Understanding (recited above) that promotes training opportunities for employees. Negotiations could lead to resolution of other differences between the parties.

As a final point, Citgo relies on language in Article II, Section 1 that removes "office clerical employees" from the bargaining unit. The paperwork part of a Loader's job was performed exclusively by members of the Bargaining Unit from 2000 to 2010. It was not considered office clerical work until Solvents Clerks were hired in September 2010. It did not lose it status of being a component of a Loader's job after that date because Loaders still performed the work for one shift every work day and when Solvents Clerks were not able to perform the work. Solvents Clerks are outside contractors and are not "office clerical employees" as that term is used in Article 2, Section 1.

In this case, two additional people were added to the work crew in the solvents loading rack. One would expect their work would enable this operation to perform more efficiently. On the other hand, the fact that these Solvents Clerks work 80 hours per week without a significant increase in volume of work shows that Loaders worked very efficiently before the Contract Clerks were hired. The Loaders did their duty of filling tanker trucks and processed paperwork that the Solvents Clerks took 80 hours per week to complete.

## **ORDER**

1. The grievance is denied in part and granted in part as explained in the Award. The Company's use of Solvents Clerks complies with terms of the Contract. The Company did not comply with its duty to bargain with the Union in good faith over this issue.

2. The parties are directed to bargain over the issue of the performance of the paperwork component of Loaders' work. This bargaining is to occur within 45 days of the date of this Award. The Company's goal of efficiency has to be balanced with the Union's interest in job security.

3. The Company is directed to provide full answers in monetary terms to the Union's request for information (Un. Ex. 6), particularly items number 2, 3 and 6.

14

4.     The Arbitrator will retain jurisdiction over this case for ninety days of the date of this Award to give the parties whatever assistance they may need in implementing the terms of the Award.

_____
ALAN J. COOK
Impartial Arbitrator

Dated at Chicago, Illinois

this 19th day of July, 2018.

15