**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-cv-6339 |
| v. | ) ) | Hon. Steven C. Seeger |
| UNITED STEELWORKERS UNION, LOCAL UNION NO. 7-517, | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Ten years ago, CITGO hired two contractors to serve as Solvent Clerks at a local refinery. The two clerks took over some of the paperwork formerly done by bargaining unit employees. The Union at the plant responded by filing a grievance, and the dispute ultimately led to arbitration. After an evidentiary hearing, the arbitrator decided that the Collective Bargaining Agreement entitled the Company to hire the contractors. But he also found that CITGO had violated its duty to bargain.

The Collective Bargaining Agreement provides that there "will be no appeal from such award," and that it "will be final and binding upon the Union . . . as well as upon the Company." Nonetheless, CITGO filed suit and challenged the arbitrator's decision about the duty to bargain. The Company and the Union later filed cross-motions for summary judgment.

Under Seventh Circuit case law, a challenge to an arbitration decision faces a steep uphill climb. A court must affirm an award unless there is no possible interpretive path to get where the arbitrator landed. Here, the parties agreed that an arbitrator would interpret the contract, and

they got exactly what they bargained for.  CITGO's motion for summary judgment is denied, and the Union's motion for summary judgment is granted.

## Background

The parties have no dispute about the facts.  CITGO admitted all of the facts offered by the Union in support of its motion for summary judgment.  *See* Union's Statement of Material Facts (Dckt. No. 17); CITGO's Resp. to Union's Statement of Material Facts (Dckt. No. 25) (responding to each of the 22 paragraphs by stating that "CITGO does not dispute the facts").

The Union essentially admitted all of the facts in CITGO's Statement of Undisputed Facts, too.  The Union responded that it "does not dispute" the facts in 16 of the 18 paragraphs. *See* CITGO's Statement of Undisputed Material Facts (Dckt. No. 21); Union's Resp. to CITGO's Statement of Material Facts (Dckt. No. 24).[1]

In the other two paragraphs, the Union didn't dispute the facts, either.  It simply responded that the Court should "discount" the allegations because they addressed the merits of the underlying dispute, as opposed to the arbitrator's decision.  *See* Union's Resp. to CITGO's Statement of Material Facts, at ¶¶ 6–7 (Dckt. No. 24).  The Union also took issue with the "characterization" of the arbitrator's decision in a few paragraphs (*id.* at ¶¶ 15–16), but the arbitrator's decision speaks for itself.

### *The Parties, and the Collective Bargaining Agreement*

In 1997, CITGO acquired a refinery in Lemont, Illinois, a suburb about 25 miles southwest of Chicago.  *See* CITGO's Statement of Undisputed Material Facts, at ¶ 4 (Dckt. No. 21).  The refinery produces gasoline, diesel, petrochemicals, and other fuels.  *Id.*

---

[1] There are 19 numbered paragraphs, but paragraph "8" is missing.  So there are only 18 paragraphs.

Three years later, CITGO and the Union entered into their first Collective Bargaining Agreement (the "CBA," or the "Agreement"), and have entered into several renewal agreements ever since. *Id.* at ¶ 5. The CBA at issue here was in effect from February 2009 to February 2012. *See* Union's Statement of Facts, at ¶ 3 (Dckt. No. 17). The Agreement included a so-called "recognition clause," in which the "Company recognize[d] the Union as the sole and exclusive Collective Bargaining Agency [sic] for all hourly production and maintenance employees of the Company at its Lemont, Illinois refinery and facilities . . . for the purpose of collective bargaining with respect to pay, wages, hours, and other conditions of employment." *Id.* at ¶ 4 (quoting CBA, Art. II, § 1); *see also* CBA (Dckt. No. 21-2).

The Union represents certain direct-hire employees (almost 250 workers) at the facility, known as "bargaining unit" employees. *See* CITGO's Statement of Facts, at ¶ 5 (Dckt. No. 21); *see also* Arbitration Award, at 2 (Dckt. No. 21-8). But not all workers at the refinery are members of the Union. Since 1997, CITGO has employed a mix of Union bargaining unit employees and outside contractors. *See* CITGO's Statement of Facts, at ¶ 6 (Dckt. No. 21). The outside contractors work alongside the bargaining unit employees and, in many cases, perform the same functions.[2] *Id.*

The CBA gives CITGO the express contractual right to hire contractors. In fact, every agreement between the Company and the Union has recognized the Company's management right to "'hire contractors.'" *Id.* at ¶ 7 (quoting CBA, Art. IX, § 4). "[I]t is expressly understood and agreed that the usual and customary rights of the employer remain unimpaired. It is also understood that these rights include, but are not limited to, the right to manage the business and

---

[2] The Union claims that these facts are "immaterial" to this lawsuit. *See* Union's Response to CITGO's Statement of Material Facts (Dckt. No. 24). Still, they provide some helpful background.

direct the workforce; determine the number of employees required; hire contractors . . . ." *See* CBA, Art. IX, § 4 (Dckt. No. 21-2); *see also* Union's Statement of Facts, at ¶ 5 (Dckt. No. 17).

Even so, CITGO agreed that it would not "displace any bargaining unit employee with outside contractors," and that "no bargaining unit employees will suffer a reduction in regularly scheduled hours due to the Company's use of contractors.'" *See* CITGO's Statement of Facts, at ¶ 7 (Dckt. No. 21) (quoting CBA, Art. IX, § 15). So, CITGO can "hire contractors," but cannot "displace" bargaining unit employees or reduce their "scheduled hours." *See* CBA, Art. IX, §§ 4, 15 (Dckt. No. 21-2). But there's another caveat, too. The Company's rights are "[s]ubject to the provisions of this Agreement and to the right of the Union as the Collective Bargaining Agen[t]." *See id.*, Art. IX, § 4.

### The Operation of the Refinery, and the Hiring of Two Contractors

Customers send tanker trucks to CITGO's refinery to fill up with petrochemicals. *See generally* Arbitration Award, at 2–4 (Dckt. No. 21-8). The trucks pull into a place with an industrial-sounding name: the "solvents loading rack." *Id.* at 2. The rack has four bays for trucks to load solvents, plus a "blend bay" to load products that contain a mix of petrochemicals. *Id.* The refinery can fill 25 to 30 trucks per day.[3] *Id.* at 3.

The workers who load tanker trucks at the refinery are called, aptly enough, Loaders. *Id.* The Loaders are responsible for safely filling the tanker trucks with hazardous chemicals. *Id.* Eight Loaders work at the refinery each day. *Id.* at 2. The Loaders work in shifts: three from 6:00 a.m. to 2:00 p.m., two from 2:00 p.m. to 10:00 p.m., two from 10:00 p.m. to 6:00 a.m., and one on a relief schedule. *Id.* at 2–3.

---

[3] The facts in this paragraph, and in a few paragraphs that follow, come from the arbitrator's decision, not the summary judgment submissions by the parties. Such facts are not material to this Court's review of the arbitrator's decision. Still, the Court includes them because they add color and help bring the dispute to life.

The job also requires Loaders to complete a stack of paperwork, both before and after filling each truck. *Id.* at 3. They must process "a load request form, multiple copies of a bill of loading, a certificate of analysis with associated seals and placecards, a load verification sheet, a meter ticket," and generate a "load list form." *Id.* The paperwork is important given the potential danger posed by the petrochemicals. *Id.* And completing the paperwork takes time.

The Loaders traditionally completed the paperwork. *Id.* But in 2010, the Company changed course and hired two contractors to serve as Solvent Clerks. *Id.* at 4. The contractors took over the responsibility to "prepare and complete paperwork that Loaders had processed in filling customers' orders," so that "Loaders could focus on their sole task of filling tanker trucks." *Id.*

Apparently, in the Company's view, the paperwork was taking too much time, and causing too many delays in filling the customers' orders. Customers didn't like waiting. *Id.* at 3–4. And time was money – literally. CITGO had to pay "demurrage penalties" if customers waited more than two hours before being loaded. *Id.* at 4. And in 2010, the Company racked up $293,000 in penalties. *Id.*

### *The Grievance*

The hiring of the two contractors prompted the Union to file a grievance, and thus set in motion a dispute resolution process under the CBA. The Agreement outlined a procedure to address "differences . . . between the Company and the Union, or any employees of the Company as to the meaning and application of the provisions of this Agreement." *See* CBA, Art. X, § 1 (Dckt. No. 21-2); *see also* CITGO's Statement of Facts, at ¶ 10 (Dckt. No. 21); Union's Statement of Facts, at ¶ 6 (Dckt. No. 17). The first step is for an employee to "take up the matter" with his or her supervisor. *See* CBA, Art. X, § 1.A (Dckt. No. 21-2). From there, the

next step is to submit a written grievance, and then follow a process to escalate the issue with management. *Id.* at Art. X, §§ 1.B, 1.C.

If the parties remain at loggerheads, the CBA allows either party to pursue arbitration. *See id.* at Art. X, § 1.F (providing that "any proper grievance" may be "referred to an arbitrator"). The arbitrator has the power to conduct a hearing. *Id.* The arbitrator – like the parties themselves – is bound by the Agreement. "The Arbitrator will be governed wholly by this Agreement and will have no power to change the Agreement by adding to or taking away any of its terms." *Id.*

The arbitrator's word is the final word. "There will be no appeal from such award, and it will be final and binding upon the Union and its members, upon the employee or employees involved, as well as upon the Company." *See* CBA, Art. X, §§ 1, 1(F). The arbitrator has the final word, that is, if he interprets the Agreement.

The Union kicked off this procedure in 2010 when it filed the grievance about the hiring of the two Solvent Clerks. The Grievance Report included a one-sentence "Statement of What Happened." *See* Complaint or Grievance Report (Dckt. No. 21-3). "The Company has employed 2 contractor clerks to perform the work of solvents rack employees.'" *Id.*; *see also* Union's Statement of Facts, at ¶ 7 (Dckt. No. 17). The Union argued that the two contractors were performing paperwork duties associated with filling tanker trucks of CITGO customers. *See* CITGO's Statement of Facts, at ¶ 9 (Dckt. No. 21). The Union believed that those duties belonged to the direct-hire bargaining unit employees. *Id.*

The Union charged the Company with violating a number of provisions of the Agreement. Specifically:

- Article II, section 1 (the "recognition clause," which states that the "Union is the sole exclusive Collective Bargaining Agen[t] . . . for the purpose of collective bargaining");

- Article IV, section 3.B ("Plant-wide Bids" for filling vacancies);

- Article V, section 5 (remaining on the job until relieved; shift vacancies);

- Article VI (overtime);

- Article IX, section 16 (no bargaining-unit work performed by supervisors);

- Article XIII, section 2 (lines of progression from one position to another);

- Article XIII, section 4 (normal filling of positions – operations); and

- OT agreements.

*See* Complaint or Grievance Report (Dckt. No. 21-3); *see also* CBA (Dckt. No. 21-2); Union's Statement of Facts, at ¶ 7 (Dckt. No. 17).

CITGO denied the grievance, arguing that the Collective Bargaining Agreement allowed the work by the contractors. *See* CITGO's Statement of Facts, at ¶ 9 (Dckt. No. 21). The CITGO Supervisor answered: "The Company intends to utilize the 2 Contract Clerks on a trial basis for 6 months in order to evaluate whether the paperwork is the problem with delaying loading. After this trial period the Company will inform the Union of the results. The trial is not a violation of the contract and this grievance is denied." *See* Dckt. No. 1-2, at 3 of 3.

### The Arbitration

The "6 month[]" trial period turned into seven years, and the parties were unable to resolve their differences. *Id.*; Union's Statement of Facts, at ¶ 8 (Dckt. No. 17). So the Union eventually appealed the grievance to arbitration. *See* CITGO's Statement of Facts, at ¶ 11 (Dckt. No. 21); Union's Statement of Facts, at ¶¶ 8–9 (Dckt. No. 17). Arbitrator Alan J. Cook presided

over a hearing on March 13, 2018. *Id.*; *see generally* Arbitration Tr. (Dckt. No. 17-1); Dckt. No.

40 (minuscript version). During the hearing, the parties had a full and complete opportunity to

introduce evidence, examine and cross-examine witnesses, and present arguments. *See* Union's

Statement of Facts, at ¶ 9 (Dckt. No. 17). Each party submitted post-hearing briefs, too. *See*

CITGO's Post-Hearing Brf. (Dckt. No. 21-6); Union's Post-Hearing Brf. (Dckt. No. 21-7).

At the outset of the hearing, the arbitrator acknowledged that the issue was a matter of

contract interpretation. He invoked the CBA right off the bat:

| | |
|---|---|
| **Arbitrator:** | Good morning, everybody. My name is Alan Cook, and I've accepted the assignment of being the arbitrator for today's labor grievance arbitration hearing. |
| | . . . |
| | And I understand in this case, this is a matter of contract interpretation; is that right? |
| **Union Counsel:** | Yes. |
| **Company Counsel:** | Yes. |

*See* Arbitration Tr. at 5:1–4, 5:22 – 6:2 (Dckt. No. 17-1); *see also* CITGO's Statement of Facts,

at ¶ 12 (Dckt. No. 21).

Before opening statements, the arbitrator invited the parties to frame their dispute. The

Union's counsel responded that the "issue is dealing with the use of outside contractors that are

performing work that the Union feels is Bargaining Unit work." *See* Arbitration Tr. at 13:8–10

(Dckt. No. 17-1); *see also* Dckt. No. 40 (minuscript version). The Company's counsel framed

the dispute along the same lines, but a "little bit more limited." *See* Arbitration Tr. at 13:22. He

responded: "So I think the question is whether or not the use of contractors violates the

Collective Bargaining Agreement or – and, more specifically, whether or not it was within the

Company's ability within Section 4 and Section 15 of Article 9 to hire these contractors." *Id.* at 14:5–11.

In his opening statement, the Union's counsel claimed that the Company was "in violation of a number of contract" provisions. *Id.* at 17:15–16. He then gave seven specific examples, citing each of the provisions listed in the grievance. *Id.* at 17:16 – 18:10. "All of these violations have occurred since the hiring of the two contractor clerks at the solvents loading racks." *Id.* at 18:11–13.

But the Union's counsel also invoked the right to bargain. It wasn't much, but he did devote two or three sentences of his opening to the need to bargain. "The long-time use of the contractors only substantiates the need of the clerk jobs at the solvent loading rack. The clerk jobs are and have remained a mandatory subject of bargaining. At no time has the Union given up its right to bargain." *Id.* at 19:15–20.

The parties continued to characterize the grievance as a contractual dispute in their post-hearing briefs. CITGO framed the "Issue" as follows: "Whether the use of outside contractors in the Solvents Loading Rack at the Lemont Refinery was within the parties [sic] rights under Art. IX, Secs. 4 and 15" of the Collective Bargaining Agreement. *See* CITGO's Statement of Facts, at ¶ 13 (Dckt. No. 21) (quoting CITGO Post-Hearing Brf., at 3 (Dckt. No. 21-6)). The Union's statement of the issues was along the same lines: "The prolonged use of the two (2) Contractor Clerks only substantiates the need for permanent work, which is USW Bargaining Unit Work. The Company has no right to violate the Collective Bargaining Agreement." *See* Union Post-Hearing Brf., at 6 of 25 (Dckt. No. 21-7); *see also* CITGO's Statement of Facts, at ¶ 13 (Dckt. No. 21).

### *The Arbitrator's Decision*

The arbitrator issued a written decision and denied in part and granted in part the grievance. The arbitrator defined the "**ISSUE**" as follows: "The Arbitrator finds the Issue for this case is whether the Company's use of outside contractors in the Solvents Loading Rack at its Lemont Refinery violated the terms of the parties' Collective Bargaining Agreement; and, if it did, what remedy would be appropriate?" *See* Arbitration Award, at 2 (Dckt. No. 21-8) (bold in original).

The arbitrator ruled in favor of the Company on the core issue of the hiring of the contractors. The arbitrator noted that Article IX of the CBA expressly entitled CITGO to "hire contractors." *Id.* at 12. Hiring the two contractors did not violate the Agreement because the "evidence shows the hiring of two Clerks did not displace any bargaining unit employees and no Union member suffered a reduction in regularly scheduled hours." *Id.* And Article IX, section 15 blessed "efficiency" as a legitimate objective. *Id.*

The arbitrator went out of his way to invoke the language of the CBA. "The language of the Contract cannot be ignored." *Id.* The arbitrator pointed to the Agreement's text, which required the arbitrator to be "governed wholly" by the CBA, and gave him "no power" to change the terms of the deal. *Id.* (quoting CBA, Art. X). Any other approach could lead to federal litigation: "If the Arbitrator were to ignore the clear and unambiguous terms of the Contract, the Award could be set aside by a court of law." *Id.*

The very next paragraph of the decision sparked this federal litigation.

The arbitrator turned to the duty to bargain. "However, there is another aspect of this case that must be considered. The National Labor Relations Act places on employers a mandatory duty to bargain with authorized employee representatives on subjects that include

rates of pay, wages, hours of employment and other conditions of employment." *Id.* at 12–13

(citation omitted).

After quoting a treatise, the arbitrator devoted a paragraph to the Company's failure to

bargain over the hiring of the two contactors:

> In the case at hand, the Company carved out a significant part of a Loader's duties and gave it to an outside contractor for reasons of economy and efficiency. Loaders' working conditions and job security were affected by Citgo's action in removing the paperwork component of their job. The Union protested the Company's action, and it asked the Company to bargain over this issue. Citgo rejected the request to bargain and took unilateral action to implement its decision to hire Clerks to perform the paperwork part of the Loaders' duties. ***Citgo's action violated its duty to bargain*** over its plan to make a significant change in a Loader's duties.

*Id.* at 13 (emphasis added).

### The Filing of this Litigation

CITGO did not comply with the arbitrator's bargaining order. *See* CITGO's Statement of

Facts, at ¶ 18 (Dckt. No. 21). Instead, the company filed this lawsuit. CITGO seeks to vacate

the arbitration award to the extent that it addresses the duty to bargain. The company also seeks

to vacate paragraphs 2–4 of the arbitrator's order.

The Union filed a counterclaim, asking the Court to "[c]onfirm and enforce" the

arbitration award and order CITGO to comply. *See* Answer and Counterclaim, at 7 (Dckt. No.

10). But the Union did not ask the Court to vacate any portion of the arbitrator's award. So, the

Union is not challenging the arbitrator's decision that the Collective Bargaining Agreement

entitled the Company to hire the two contractors.

### Analysis

Arbitration decisions receive a "hospitable reception" in federal court, and then some.

*See Butler Mfg. Co. v. United Steelworkers of Am.*, 336 F.3d 629, 630 (7th Cir. 2003). Courts

show "extreme deference" to an arbitrator's award in a dispute about a collective bargaining agreement. *See United Food and Commercial Workers, Local 1546 v. Illinois-American Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009). The Seventh Circuit has described judicial review of an arbitration decision as "severely limited," "extremely narrow," and "extraordinarily deferential." *See Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991); *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 183 (7th Cir. 1985); *Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616 (7th Cir. 2018).

Second-guessing the merits of an arbitrator's decision is off the table. Courts have "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). "Federal courts do not review the soundness of arbitration awards." *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1504–05 (7th Cir. 1991). Judicial deference applies even if the "court is convinced he committed [a] serious error" of fact or law in reaching the decision. *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (cleaned up).

Judicial review of a labor arbitration award typically is "confined" to the "narrow question" of "whether the arbitrator's reasoning draws its essence from the parties' agreement." *See Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 600 (7th Cir. 2017); *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An arbitrator's decision "draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be." *United Food*, 569 F.3d at 754. It is enough that the "arbitrator's interpretation can in some rational manner be derived

from the collective bargaining agreement." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993).

The question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987). And "[i]f they did, their interpretation is conclusive." *Id.* A party "will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation." *Id.* Once the court is satisfied that the arbitrator interpreted the agreement, "judicial review is at an end." *Id.*

"Indeed, our review is 'close to nonexistent' if the arbitrator 'interprets' rather than 'revises' the collective bargaining agreement." *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Engineers*, 348 F.3d 671, 675 (7th Cir. 2003) (quoting *Ladish Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*, 966 F.2d 250, 252 (7th Cir. 1992)) (internal quotation marks omitted). If in doubt about whether the arbitrator interpreted the contract, courts affirm the award. "We resolve any reasonable doubt about whether an award draws its essence from the collective bargaining agreement in favor of enforcing the award." *American Postal Workers Union v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999); *Polk Bros., Inc. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent)*, 973 F.2d 593, 597 (7th Cir. 1992). The tie goes to the arbitrator.

Courts defer to arbitration decisions because that's what the parties bargained for – a resolution of disputes through arbitration, not litigation. *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960); *Northern Indiana Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 347 (7th Cir. 2001). Otherwise, "arbitration would

just be the first of a series of steps that always culminated in court litigation, and it would lose its *raison d'être*." *Butler*, 336 F.3d at 632. "Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993).

Another "reason[] for insulating arbitral decision from judicial review" is the "decided preference for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37 (1987); *see also Butler*, 336 F.3d at 630 (noting that deferential judicial review allows arbitrators to "play their role of reducing industrial strife and maintaining a harmonious workplace"); *see also Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616–17 (7th Cir. 2018) ("This extraordinarily deferential standard of review is grounded in courts' respect for the role of the labor arbitrator in administering 'a system of industrial self-government.'") (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580 (1960)).

The window for judicial review is narrow, but not closed. The Labor Management Relations Act grants jurisdiction to federal courts to determine whether the arbitrator "exceeded the scope of his submission." *See Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 617 (7th Cir. 2018); *see also* 9 U.S.C. § 10(a)(4) (authorizing district courts to vacate an arbitration award when the "arbitrators exceeded their powers"). A court has the power to vacate an award if the "arbitrator had exceeded the powers delegated to him by the parties." *See Dexter Axle Co. v. Int'l Ass'n of Machinists*, 418 F.3d 762, 768 (7th Cir. 2005) (cleaned up). That delegated power is typically limited to interpreting the contract. *See U.S. Soccer Federation, Inc. v. U.S. National Soccer Team Players Assoc.*, 838 F.3d 826, 832 (7th Cir. 2016). If "there is no possible interpretive route to the award," then a "noncontractual basis can be inferred and the

award set aside." *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505–06 (7th Cir. 1991).

An arbitrator "is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An arbitrator's "source of authority" is the collective bargaining agreement, and he or she "has no general authority to invoke public laws that conflict with the bargain between the parties." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974); *see also Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991) ("The arbitrator is not free to think or to say, 'The contract says X, but my view of sound policy lead me to decree Y.'"). That is, "[i]t is only when the arbitrator *must have* based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to 'draw its essence from the [CBA].'" *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292 (7th Cir. 1996) (emphasis in original) (quoting *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184–85 (7th Cir. 1985)).

Still, the Supreme Court used a strong word to describe what it takes for an arbitrator to step out of bounds: "infidelity." *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "When the arbitrator's words manifest an *infidelity* to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* (emphasis added). Not merely wrong. Not misguided. Not unpersuasive or illogical. Unfaithful to the mission at hand.

Simply put, arbitrators "exceed their jurisdiction if they fail to interpret the collective bargaining agreements between the parties. . . . They do not exceed their jurisdiction if they

make a mistake in interpreting a collective bargaining agreement." *Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Central Conference v. Union Pac. R.R. Co.*, 719 F.3d 801, 803 (7th Cir. 2013). What's required is not the *correct* decision, but an "*honest* decision." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993) (emphasis added).

An arbitrator's authority "is also limited by the actual issue submitted by the parties." *See American Postal Workers Union v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999); *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) ("Arbitrators have the authority to decide only those issues actually submitted by the parties."); *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Engineers*, 348 F.3d 671, 677 (7th Cir. 2003). A "reviewing court must also determine whether the arbitrator's decision went beyond the scope of the issue submitted." *Runyon*, 185 F.3d at 835. But once again, deference is the name of the game. "The arbitrator's interpretation of the scope of the issue must be upheld so long as it is rationally derived from the parties' submission." *Id.*

CITGO advances three arguments against the arbitrator's decision that the Company violated the duty to bargain. *See* CITGO's S.J. Mem. (Dckt. No. 22). First, CITGO argues that the parties never asked the arbitrator to decide anything about the duty to bargain, so that issue was never on the table for the arbitrator to decide in the first place. Second, the Company contends that the decision drew its essence from the statute, not the Collective Bargaining Agreement. Third, the Company claims that the decision violates public policy.

CITGO has failed to carry its "heavy burden" over the "high hurdle." *See Dexter Axle Co. v. International Assoc. of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d

762, 767 (7th Cir. 2005); *Arch of Illinois, a Division of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292 (7th Cir. 1996).

## I. The Arbitrator Plausibly Determined that the Duty to Bargain Was Part of the Dispute.

CITGO's primary argument is that the arbitrator's decision was *ultra vires* because the duty to bargain was not one of the issues submitted by the parties for arbitration. *See* CITGO's S.J. Mem., at 8–10 (Dckt. No. 22).

The Company insists that the "only issue that the parties submitted to Arbitrator Cook was whether their *collective bargaining agreement* permitted or prohibited CITGO's actions." *Id.* at 8 (emphasis in original). The Company cites a litany of examples of the parties framing the issue as a dispute about the meaning of the contract. *Id.* at 9. CITGO essentially argues that the arbitrator should have stopped after it decided that the Company could hire the contractors. That was the "single issue" in the arbitration. *Id.* at 10.

CITGO makes a reasonable argument that the hiring of the two contractors was the primary – if not the only – issue for the arbitrator to decide. After all, the grievance itself included the following one-sentence description of the dispute: "The Company has employed 2 contractor clerks to perform the work of solvents rack employees." *See* Complaint or Grievance Report (Dckt. No. 21-3). At first glance, and perhaps after a second inspection, the grievance didn't invoke the duty to bargain.

The problem for CITGO is that its interpretation is not the only possible interpretation. Another part of the grievance suggests that the dispute was broader than the right to hire the two contractors. Portions of the hearing, and passages from a post-hearing brief, support a broader reading, too. Or at the very least, an arbitrator could have reached that conclusion.

Consider, for example, the very first provision of the Collective Bargaining Agreement cited in the grievance. The Company claimed that the hiring of the clerks violated the "recognition clause," meaning the clause that recognized the Union as the "sole and exclusive Collective Bargaining Agen[t] . . . for the purpose of collective bargaining." *See* Complaint or Grievance Report (Dckt. No. 21-3); CBA, Art. I, § 1. By invoking its status as the bargaining agent, the Union seemingly raised the argument that the Company violated the duty to bargain. In fact, what else could it mean? How else could CITGO have violated the Union's right as the bargaining agent except by refusing to bargain?

Maybe the Union was simply arguing that the contractors were doing bargaining unit *work*, meaning work that members of the bargaining unit should have been doing. That's a reasonable (if not better) interpretation of the Union's argument. But it's not the only possible interpretation. The arbitrator could have concluded that the Union was complaining about the failure to bargain, in and of itself.

The opening moments of the hearing put the duty to bargain squarely in play. The arbitrator invited each side to frame their dispute. *See* Arbitration Tr. at 12–13 (Dckt. No. 17-1). Right off the bat, counsel for the Union recounted the provisions that the Company allegedly violated, including the recognition clause. *Id.* at 17–18. And then the Union complained about CITGO's failure to bargain:

> The long-time use of the contractors only substantiates the need of the clerk jobs at the solvent loading rack. The clerk jobs are and have remained a ***mandatory subject of bargaining***. ***At no time has the Union given up the right to bargain***. The Company made a ***unilateral decision*** to employ the two contractor clerks based on the need to help expedite the loading of the tank trucks at the solvent rack.

*Id.* at 19:15–24 (emphasis added).

So, the Union had the "right to bargain." *Id.* Bargaining was "mandatory," but the Company made a "unilateral" decision to hire the contractors. *Id.* Based on that opening salvo, the arbitrator could hardly be faulted for thinking that the right to bargain was part of the dispute.

When the Company had its turn to speak, counsel did not object. CITGO's counsel did not deny that the duty to bargain was part of the dispute. The arbitrator heard no push-back. The point is not that the Company waived the objection (even though that's a potential issue, too). *See AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter."). The point is that it was not unreasonable for the arbitrator to conclude that the duty to bargain was at play. The Company's current insistence that the hiring of the two contractors was the "single issue" is difficult to square with what the arbitrator heard at the time. *See* CITGO's S.J. Mem., at 10 (Dckt. No. 22).

The Union's counsel elicited supportive testimony, too (not a lot, but a little). The Union called as a witness Michael Hendry, the Chief Operator at the refinery and the President of the USW Local 7-517. *See* Arbitration Tr. at 120. He testified that the Union made offers to address the situation, but the Company did not bargain:

> **Q:** Did the Union demand to ***bargain*** over the use of the contractor clerks?
>
> **A:** We did make offers of remedy through the grievance procedure, things that we saw [that] would make the situation right, such as posting bids.
>
> Now that the Company has done this study and justified an additional 80 hours' worth of full-time work, Bargaining Unit work, we made proposals to staff those with Bargaining Unit people. Those proposals were rejected through the grievance procedure.

> The position of taking to bargain, there are procedures in the CBA that allow for the Company or the Union to come forward and make proposals if they wish to change items in the CBA during the midterm of the agreement. The Company had never done that with regard to this issue.

> **Q:** So was the move by the Company a ***unilateral*** position?

> **A:** Yes.

*See* Arbitration Tr. at 125:1–22 (Dckt. No. 17-1) (emphasis added); *see also* Dckt. No. 40

(minuscript version). He later testified that the company never gave up its right to bargain about

hiring contractors:

> **Q:** So, to your knowledge, we've never given up the ***right to bargain*** those positions that the clerks are in at the solvents rack, have we?

> **A:** No.

> **Q:** And has the Company approached the Union at any point in time since this grievance was filed in the last few years to try to rectify this situation?

> **A:** Not that I'm aware of.

> **Q:** And have we always maintained that that work is USW bargaining work?

> **A:** Yes.

*See* Arbitration Tr. 132:20–133:8 (emphasis added). Again, the point is not whether the Union's

position was correct. The point is that the "right to bargain" was an issue in the arbitration – or

at the very least, the arbitrator could have thought so.

The Union's post-hearing brief continued the same thread. The very first page

complained that the Company had violated the duty to bargain: "While there is some language

in the Contract, there is nothing that permits the use of Permanent Resident Contractors, to

permanently take away Represented Bargaining Unit Work. The Employer ***never offered to***

*bargain* over its decision to hire the two (2) Clerk Contractors." *See* Union's Post Hearing Brf. (Dckt. No. 21-7, at 4 of 25) (emphasis added).

There are other examples, too. The Union complained about the "unilateral move" by the Company. *Id.* In fact, the very first sentence in the Union's Argument section complained about CITGO's unilateral action: "The Employer does not have a *unilateral* right to subcontract production work permanently because the CBA limits its rights." *Id.* at 8 (emphasis added). The Union summarized testimony from Jeff Rutter, the Company's Labor Relations Manager: "Mr. Rutter also testified to Contract Language on how operating post may be realigned [sic], but would be subject to *bargaining* with the Union. There was also testimony by Mr. Rutter on how a newly created job position would have to be *negotiated* with the Union." *Id.* at 9–10 (emphasis added).

To cement the point, the Union complained about CITGO's unilateral decision in its Conclusion, too: "The Company made a *unilateral* decision in this matter and continues to rubber band its language on contractor usage, while eroding the Bargaining Unit which undermines our Contract in its entirety." *See id.* at 10 of 25 (emphasis added).

Notice how each of those quotes invoked the Agreement. Was it a persuasive contractual argument? Maybe not. But that was an issue for the arbitrator – not this Court – to decide.

After listening to the parties, the arbitrator decided that the duty to bargain was one of the issues in his portfolio. In his very first sentence summarizing the Union's position, the arbitrator painted the dispute in broad strokes: "The Union asserts Citgo never offered to bargain over its decision to hire two contractor clerks." *See* Arbitration Award, at 8 (Dckt. No. 21-8). The arbitrator broadly construed the grievance to encompass the failure to bargain:

> The Union protested the Company's action, and **it asked the Company to bargain** over this issue. **Citgo rejected the request to**

> **bargain** and took unilateral action to implement its decision to hire
> Clerks to perform the paperwork part of the Loaders' duties. Citgo's
> action violated its **duty to bargain** over its plan to make a significant
> change in a Loader's duties.

*See* Arbitration Award, at 13 (emphasis added). So, as the arbitrator understood the grievance, the "request to bargain" was embedded in the "protest[]" from the very beginning. *Id.*

Viewed as a whole, the record included a basis for the arbitrator to conclude that the duty to bargain was one of the issues on the table. Maybe it was more of a toehold than a foothold. Maybe it wasn't the primary issue. And maybe it didn't receive much attention, compared to the right to hire the contractors in the first place. But the duty to bargain did play a role in the arbitration, and that is enough.

Again, the standard of review is highly deferential. There is "extremely limited" room to second-guess the arbitrator's understanding of the scope of the arbitration. *See AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000). This Court must uphold the arbitrator's understanding of the issue if it is "rationally derived from the parties' submission." *Runyon*, 185 F.3d at 835. This record easily meets that standard.

The Company offers one Seventh Circuit case, but it doesn't help its cause. *See AGCO Corp. v. Anglin*, 216 F.3d 589 (7th Cir. 2000). *ACGO* involved an attempt to rope-in a company that never signed the arbitration agreement. *Id.* at 594 ("[T]he Anglins had no reason to suspect that their arbitration agreement with AGCO would expand to encompass a dispute with Agricredit, a nonsignatory."). The arbitrator couldn't decide the rights of a "stranger to the arbitration agreement." *Id.* But CITGO is no stranger to the CBA.

CITGO's other two cases don't lend much of a hand, either. In *Part-Time Faculty Assoc. at Columbia College Chicago v. Columbia College Chicago*, 2017 WL 5192023 (N.D. Ill. 2017), the arbitrator decided a representation issue even though the union "expressly disclaimed" before

the hearing that that issue was part of the arbitration. *Id.* at *2; *id.* at *9 ("PFAC neither intended nor believed that it was submitting a representation issue to the arbitrator to resolve. Indeed, PFAC expressly disavowed any intention to challenge the NLRB's representation ruling in the arbitration in its arbitration briefing."). Here, the Union never took the position that the duty to bargain was off the table. If anything, it did the opposite, and raised the issue from the get-go.

In *General Mills, Inc. v. BCTGM Local 316G*, 2014 WL 5100650 (N.D. Ill. 2014), the parties agreed to arbitrate a discharge issue, and the arbitrator awarded damages to the employee. But the arbitrator then gratuitously awarded damages to the union, too, because the company never had the employee sign Attendance Reviews, and because the company had failed to provide documents to the union. *Id.* at *3. The Court held that the arbitrator had "punished General Mills" without justification on issues that were well "outside the scope of the arbitration." *Id.* at *5. But the arbitrator here imposed no such gratuitous punishment.

The duty to bargain may not have been front and center in the hearing. Most of the action revolved around hiring the contractors, not bargaining about their hiring. But the duty to bargain was "rationally derived from the parties' submission," so this Court must defer to the decision of the arbitrator about what was at issue. *Runyon*, 185 F.3d at 835.

## II.     The Arbitrator's Decision Drew its Essence from the Collective Bargaining Agreement.

CITGO's fallback argument is that the arbitrator rested his decision on the statute, not the Collective Bargaining Agreement. *See* CITGO's S.J. Mem., at 10–11 (Dckt. No. 22).

The Company points to the fact that the arbitrator cited the National Labor Relations Act on page 12 of his decision, right before concluding that the Company violated the duty to bargain. *Id.* The arbitrator wrote: "However, there is another aspect of this case that must be considered. The National Labor Relations Act places on employers a mandatory duty to bargain

23

with authorized employee representatives on subjects that include rates of pay, wages, hours of employment and other conditions of employment (29 U.S.C. Sec. 151 *et seq.*)." *See* Arbitration Award, at 12 (Dckt. No. 21-8). In the next paragraph, the arbitrator concluded that "Citgo's action violated its duty to bargain over its plan to make a significant change in a Loader's duties." *Id.* at 12–13.

CITGO thinks that fleeting citation to the statute is dispositive, and requires vacatur of the decision. "Thus, the at-issue portions of his award are *clearly* grounded in the arbitrator's view of enacted legislation, not the provisions of the parties' agreement." *See* CITGO's S.J. Mem., at 11 (Dckt. No. 22) (emphasis added); *see also id.* at 2 ("Arbitrator Cook made clear that the *ultra vires* portions of his award are grounded in his view of the National Labor Relations Act.").

The Company reads too much into the arbitrator's solitary reference to the statute. For starters, parsing the language of an arbitrator's decision is a perilous enterprise. "Arbitrators are not required to write opinions, any more than juries are." *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991). It would be a "serious practical mistake" to "subject the reasoning in arbitrators' opinions to beady-eyed scrutiny" because it would create a disincentive to writing them at all. *Id.*; *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions.").

Courts must not examine an arbitrator's phraseology under a judicial microscope. *See Butler Mfg. Co. v. United Steelworkers of Am.*, 336 F.3d 629, 636 (7th Cir. 2003) ("[I]t is worth reiterating that a court's review of an arbitral award does not proceed under the same principles

that would apply if it were reviewing a decision of the Social Security Administration or a bankruptcy court."). The enterprise is especially fraught with peril when, as here, a party relies on bits and pieces of a decision to construct an entire line of argument. Absent a demonstration of infidelity, a passing phrase should not turn into a "gotcha" moment for overturning an arbitrator's award.

The arbitrator's decision here is an especially poor candidate for judicial flyspecking. The arbitrator's statement of the issue framed the dispute in contractual – not statutory – terms. As he saw it, the arbitration was about whether the use of contractors "violated the terms of the parties' Collective Bargaining Agreement." *See* Arbitration Award, at 2 (Dckt. No. 21-8). Later, the arbitrator expressly recognized that he was bound by the contract and powerless to change it. "The language of the Contract cannot be ignored." *Id.* at 12. And again: the "authority of the Arbitrator is limited by the following provisions of the Contract." *Id.* And again: "If the Arbitrator were to ignore the clear and unambiguous terms of the Contract, the Award could be set aside by a court of law." *Id.*

That language appeared immediately before the snippet that the Company now views as an abandonment of the contract. And after the passage that the Company finds problematic, the arbitrator once again invoked the language of the agreement. *Id.* at 14. The reference to the statute was sandwiched between passages that showed fidelity to the agreement. Read as a whole, it is difficult to read the decision as an opinion by someone who went off the rails, or merely paid "lip service" to his mission. *See Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1293 (7th Cir. 1996). It reads like a decision by someone trying to do his level-best to be faithful to the contract.

CITGO grounds its argument in the sentence saying that the National Labor Relations Act creates a "mandatory duty to bargain." *See* Arbitration Award, at 12. CITGO tethers that passage to the paragraph that followed, where the arbitrator concluded that "Citgo's action violated its duty to bargain over its plan to make a significant change in a Loader's duties." *Id.* at 13. The Company advances a strong reading of the latter sentence, taking it for granted that the "duty to bargain" meant a ***statutory*** duty to bargain as opposed to a ***contractual*** duty to bargain. Over and over again, the Company transforms the "duty to bargain" into a "statutory duty to bargain." *See* CITGO's S.J. Mem., at 6 (Dckt. No. 22) ("Arbitrator Cook went on to conclude the Company violated its statutory duty to bargain with the Union."); CITGO's S.J. Resp., at 3 (Dckt. No. 26) ("[T]he Arbitrator clearly relied *solely* on his view of the underlying statute."); *id.* at 5 ("The arbitrator went on to conclude that the Company violated its statutory duty to bargain with the Union."); *id.* at 10 ("Arbitrator Cook unequivocally based his determination that CITGO breached its 'duty to bargain,' and his subsequent bargaining order, on statutory grounds alone."); CITGO's S.J. Reply, at 5 (Dckt. No. 29) ("His subsequent, *ultra vires* finding that CITGO breached a duty to bargain was necessarily a statutory determination.").

But the arbitrator said no such thing. The arbitrator did not say that the Union violated the ***statutory*** duty to bargain. The arbitrator concluded that the Company violated the "[] duty to bargain," and left the source of that duty up in the air.

The question then becomes whether it was possible to read the Agreement to require a duty to bargain. It is worth remembering that the very first provision invoked by the Union in the grievance was the recognition clause, which recognized the Union as the "sole and exclusive Collective Bargaining Agen[t] . . . for the purpose of collective bargaining." *See* CBA, Art. II,

§ 1 (Dckt. No. 21-2). And the management rights provision – another provision at issue – gave the Company the authority to "hire contractors," but with a catch. *See* CBA, Art. IX, § 4. That power was "[s]ubject to the provisions of this Agreement and to the rights of the Union as the Collective Bargaining Agen[t]." *Id.* The arbitrator cited both provisions. *See* Arbitration Award, at 5, 6, 9, 11–12 (Dckt. No. 21-8).

So, the Company hangs its hat on a provision that expressly recognized the rights of the Union as the bargaining agent. *See* CBA, Art. IX, § 4. It is possible to read those rights in tandem. That is, it is possible to read the Agreement to mean that the Company can hire contractors as long as it bargains with the Union first.

On its face, it is not at all obvious that the recognition clause supports any such reading. The provision seems to address *who* bargains for the employees, not *what* they have to bargain about. *See Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.*, 491 F.3d 685, 692 (7th Cir. 2007) (Sykes, J., dissenting). But the Seventh Circuit has cautioned against generalist judges injecting traditional interpretive notions into contracts with specialized meaning (especially when construed by an industry specialist). "Arbitrators, often chosen because of their expertise in the industry, may see nuances that escape generalist judges. Persons steeped in the specialized language of a trade, or the business norms against which the language was written, often eschew 'plain meaning' in favor of context, while generalists use a more text-bound approach because that is easier and less error-prone for outsiders." *See Int'l Union of Operating Eng'rs, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 746 (7th Cir. 2004).

So "what may seem 'plain' to a judge is not necessarily plain to persons with greater experience in the business that the agreement is designed to cover." *Id.* In fact, access to specialized knowledge is one of the reasons for choosing arbitration in the first place. An

arbitrator is "usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment." *See United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960); *Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 617 (7th Cir. 2018).

The need for caution is especially great when, as here, implicit terms might be at play. *See Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987) ("Contracts contain implicit as well as explicit terms, and arbitrators' authority to interpret the latter is as great as their authority to interpret the former."); *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 186 (7th Cir. 1985) ("But contracts have implied as well as express terms, and the authority of an arbitrator to interpret a collective bargaining contract includes the power to discover such terms."). Perhaps there was a gap between the Company's right to hire contractors, and the Union's right to bargain, but if so, arbitrators are "empowered to fill gaps left in contracts." *Northern Indiana Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 348 (7th Cir. 2001). Maybe the arbitrator bridged the textual gap.

By way of comparison, the Seventh Circuit acknowledged that a recognition clause was susceptible to a range of possible interpretations (in the context of arbitrability) in *Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.*, 491 F.3d 685 (7th Cir. 2007). The recognition clause in *Illinois Bell* stated that "[t]he Company recognizes the Union as the exclusive bargaining agent for [the] employees of the Company . . . ." *Id.* at 687. The Seventh Circuit found that the "recognition clause is susceptible to any number of interpretations that may impose duties of notice and negotiation upon the Company." *Id.* at 689. One possible interpretation included "requir[ing] only that the Company refrain from dealing with other labor

organizations." *Id.* at 688. But another possible interpretation was broader, "prohibit[ing] the Company from making significant changes in the terms and conditions of employment without the consent of the Union." *Id.* at 688–89. Interpreting the recognition clause narrowly or broadly was "the province of the arbitrator – not of this court." *Id.* at 689.

On the merits, reading the Company's right to *hire* in tandem with the Union's right to *bargain* might seem atextual, unconvincing, or wrong-headed. But courts routinely uphold contractual interpretations by arbitrators that are "silly" (*Ameren*), "unsound" (*NIPSCO*), "highly improbable" (*Ethyl*), "mistaken" (*J.H. Findorff & Son*), and just plain "wrong" (*Chicago Typographical*). *See Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616 (7th Cir. 2018); *Northern Indiana Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 348 (7th Cir. 2001); *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985); *Int'l Union of Operating Eng'rs, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004); *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991). "If a gaffe authorized a court to set aside the award, there would be little difference between arbitration and litigation other than the extra cost and delay of presenting the case to the arbitrator before taking it to court. That would turn arbitration on its head; the process is designed to achieve speed, lower cost, and expertise." *Int'l Union of Operating Eng'rs, Local 139 v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004).

A court's task is "limited to determining whether the arbitrator's award could *possibly* have been based on the contract." *See Bhd. of Locomotive Engineers and Trainmen v. Union Pac. R.R. Co.*, 719 F.3d 801, 807 (7th Cir. 2013) (emphasis added). Interpreting the Agreement to require bargaining before hiring contractors may not be the best reading. It may not even be a persuasive reading. But it is not an "impossible interpretation," so this Court's review is at an

end. *Id.* This Court might have reached a different result, but "it is the arbitrator who is behind the driver's wheel of interpretation, not the court." *See Dexter Axle Co. v. Int'l Assoc. of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 767 (7th Cir. 2005).

At best, the Company has seized on a potential ambiguity in the arbitrator's decision. Maybe, just maybe, the arbitrator was referring to the NLRA when he referred to the "duty to bargain." Maybe he meant that CITGO violated a *statutory* duty to bargain when he wrote "duty to bargain." *See* Arbitration Award, at 12 (Dckt. No. 21-8). That's a possible reading – but it's not the *only* possible reading. "A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960); *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292– 93 (7th Cir. 1996); *Johnson Controls, Inc., Sys. & Servs. Div. v. United Ass'n of Journeymen*, 39 F.3d 821, 825 (7th Cir. 1994). It's possible that the arbitrator relied only on the statute, but it's not *impossible* that he relied on the contract, and that's all that matters.

A second possibility is that the arbitrator invoked the statute simply to provide context about industry norms. That is, the arbitrator could have construed the Agreement's language in light of the overarching duty to bargain. Arbitrators can invoke industry norms when interpreting an agreement. *See Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Central Conference*, 719 F.3d 801, 804, 808 (7th Cir. 2013) ("The law does not, however, ban arbitrators from considering the interests at stake and relevant policy goals in coming to their decisions. . . . Arbitrators may consider more general policies and norms in determining the meaning and implications of the agreements they interpret."). So, perhaps the

arbitrator invoked the general duty to bargain to shed light on the meaning of the contract. Maybe the arbitrator simply wanted to interpret the contract in harmony with the statute.

The Union offered a third possibility in its briefs. The Union believes that the arbitrator construed the contract to incorporate external law, including the duty to bargain under the National Labor Relations Act. *See* Union's S.J. Resp., at 8 (Dckt. No. 23) ("[T]he parties incorporated the Company's statutory obligation to bargain in the recognition and management rights clauses of the CBA."); *see also* Union's S.J. Mem, at 6–7 (Dckt. No. 18). The Union doesn't explain how, exactly, the contract incorporated the statute. The argument has a distinct *ipse dixit* flavor.

Some collective bargaining agreements expressly incorporate external law, and thus give arbitrators the green light to take outside law into account when construing the agreements. The contract in *Butler Mfg. Co. v. United Steelworkers of Am.*, 336 F.3d 629 (7th Cir. 2003), is a good example. The text of the collective bargaining agreement expressly "allowed the arbitrator to consider external law." *Id.* at 636.

That's not the case here. The Union does not point to any language in the CBA that authorized the arbitrator to consider external law. Still, the lack of a textual springboard does not end the inquiry. It is not impossible to read the recognition clause – which acknowledged the Union's right to bargain – to incorporate the statutory duty to bargain. That reading can be "rationally derived from some plausible theory of the general framework or intent of the agreement." *Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 186 (7th Cir. 1985).

The situation is tricky because the contract does not expressly incorporate external law. And the arbitrator did not fully explain what he was doing, either. *See Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 618 (7th Cir. 2018) ("The trouble arises, however,

when the arbitrator's reasoning is unclear."). If he thought that the contract incorporated external law, he didn't say so out loud. Still, the solitary "reference[] to external law" is "not so clear as to defeat the deference we have traditionally accorded to labor arbitrators." *Id.* The Court cannot conclude that the "arbitral decision is based '*solely* upon the arbitrator's view of the requirements of enacted legislation,' rather than on the interpretation of the [CBA].'" *Id.* at 617 (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 35, 53 (1974)) (emphasis added; brackets in original).

CITGO looks for help in *Roadmaster Corp. v. Prod. and Maint. Emp. Local 504, Laborers' Int'l Union of N. Am.*, 851 F.2d 886 (7th Cir. 1988), but finds none. In *Roadmaster*, there was a conflict between the statute and the contract, and the arbitrator opted to apply the statute instead of the contract. *Id.* at 889 ("[T]he arbitrator should restrict his consideration to the contract, even if such a decision conflicts with federal statutory law."). The case at hand does not present the same situation. No one is arguing that a provision of the CBA conflicts with the NLRA.

The Company cries foul, arguing that the Union never advanced any such interpretation during the arbitration itself. In the Company's view, the failure to propose the incorporation theory to the arbitrator results in waiver. *See* CITGO's S.J. Resp., at 7–9 (Dckt. No. 26).

The Company misses the point. The question is whether the arbitrator could have reached his conclusion based on an interpretation of the contract. The question is not whether a party proposed that interpretation to the arbitrator. Simply put, the question is whether there was a "possible interpretive route," not whether a party pointed the way there. *Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 620 (7th Cir. 2018).

The Company fails to address the only thing that matters: whether it is *possible* to construe the contract to impose a duty to bargain. The Company never argues that it is impossible to read the CBA to require the Company to bargain with the Union about the hiring of the contractors. And if it's not impossible, it's affirmed.

In its reply, CITGO argues that the arbitrator *must have* imposed the duty to bargain on statutory grounds because he found that the hiring of the contractors did not violate the contract. *See* CITGO's S.J. Reply, at 1 (Dckt. No. 29) ("Because the Union did not prove a violation of the collective bargaining agreement, Arbitrator Cook's subsequent determination – that the Company 'did not comply with its duty to bargain' – is necessarily grounded in something *other* than the contract.") (emphasis in original).

Not so. That argument confuses substance and process. CITGO could have made a permissible decision (*i.e.,* hiring contractors), but violated the process for making that decision (*i.e.,* without bargaining). The Company could have landed at the right place, but gotten there the wrong way.

## III.    The Arbitrator's Decision Did Not Violate Public Policy.

Finally, CITGO claims that the decision violates precedent under the National Labor Relations Act, and violates public policy, too. *See* CITGO's S.J. Mem., at 11–13 (Dckt. No. 22). The Company relies on case law saying that a party can refuse to bargain over something when they have already bargained over it. *Id.* That is, there is no duty to bargain when the bargaining already took place, and resulted in a collective bargaining agreement.

CITGO's cases underdeliver. The Company relies on a few cases saying that a party does not commit an unfair labor practice when it refuses to bargain. *Id.* That's a far cry from the Company's position here, to wit, that it violates public policy to bargain a second time. Saying

that the Company doesn't *have* to bargain again doesn't mean that the Company *cannot* bargain again. Also, there is a difference between bargaining over the right to contractors in general and bargaining over the hiring of *these particular* contractors.

But the Company's argument fails for an even more basic reason. At bottom, CITGO is arguing that the arbitrator's decision doesn't make much sense. The Company shouldn't have to bargain over the hiring of contractors, so the argument goes, because the Company already bargained about the hiring of contractors. But that argument is directed at the merits of the arbitrator's decision, which is precisely what the parties and this Court aren't supposed to explore.

Maybe the arbitrator's decision runs counter to the Company's view of sound public policy. But the decision doesn't require CITGO to perform an "illegal act," so it must be affirmed. *See Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987).

## Conclusion

In the end, this case is not a dispute with a "runaway arbiter[]" where the "system breaks down completely." *See Dean v. Sullivan*, 118 F.3d 1170, 1171 (7th Cir. 1997); *Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 618 (7th Cir. 2018) (quoting *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 463 (1957) (Frankfurter, J., dissenting)). The arbitrator did not go rogue, rewrite the contract, or impose his own sense of industrial justice. The arbitrator expressed fidelity to the language of the Collective Bargaining Agreement, and interpreted that contract to the best of his ability.

A party's "choice to accept arbitration entails a trade-off." *See Dean*, 118 F.3d at 1173. A party gains a "quicker, less structured way of resolving disputes" before a "specialized arbiter." *Id.* But in exchange, a party loses the "right to seek redress from the courts for all but

the most exceptional errors at arbitration." *Id.* CITGO made that bargain, and this Court holds the Company to it.

CITGO's motion for summary judgment (Dckt. No. 20) is denied, and the Union's motion for summary judgment (Dckt. No. 16) is granted.

Date: April 10, 2020                              _____

                                                 Steven C. Seeger
                                                 United States District Judge